RICK W. MIDDAGH ET AL., APPELLEES AND CROSS-APPELLANTS, V. STANAL SOUND LTD., A NEBRASKA CORPORATION, AND STAN MILLER, APPELLANTS AND CROSS-APPELLEES.
382 N.W.2d 303

Filed February 28, 1986.   No. 84-680.

Patrick J. Nelson of Jacobsen, Orr & Nelson, P.C., for appellants.

William G. Dittrick of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellees.

BOSLAUGH, HASTINGS, SHANAHAN, and GRANT, JJ., and BRODKEY, J., Retired.

GRANT, J.

Plaintiffs-appellees, Rick W. Middagh and Donnise M. Middagh, husband and wife, filed an action for damages, as lessors under a written lease, against defendants-appellants, Stanal Sound Ltd., a Nebraska corporation, and Stan Miller, the lessees. The case was tried to the court, which awarded damages to the plaintiffs in the amount of $10,738.77. The trial court, in computing the amount of damages awarded to Middaghs, calculated the damages through October 15, 1984. The court gave Middaghs the benefit of an addendum to the original lease, which addendum permitted the Middaghs to accelerate 1 year's rental in the event of a default by lessees, and awarded certain other damages for repairs, insurance, and tax payments under the lease. In determining the damages the trial court also gave lessees credit for the rental amounts received by Middaghs under a re-lease of the premises of 17 months, a $1,625 security deposit made by lessees, and "$8,850.00 being a rent adjustment for failure of the lessor to erect fence being computed for the entire period of the lease, December 15, 1979 through and including October 15, 1984, 59 months at $150.00." Middaghs and lessees filed separate motions for new trial, both of which were overruled. Lessees appeal, and Middaghs cross-appeal.

Lessees appellants assign eight errors, which may be summarized in three categories: (1) That the trial court erred in determining that the lease was amended by the "Addendum to Lease"; (2) That the trial court erred in failing to find that Middaghs had constructively evicted lessees from the leased

premises; and (3) That the trial court erred in awarding damages to Middaghs and in determining the amount of those damages.

In their cross-appeal Middaghs assign as error the action of the court in determining that lessees were entitled to a setoff or adjustment in the rent of $8,850 because of Middaghs' failure to erect a fence; in awarding Middaghs $240 for insurance premiums paid, when the only evidence received showed the amount to be $840; and in finding the lessees were entitled to a return of their security deposit of $1,625.

We affirm the judgment of the trial court insofar as lessees' appeal is concerned, and reverse the judgment and remand the cause to the district court on Middaghs' cross-appeal to increase the amount of the judgment.

In an action at law where a jury has been waived, the findings of the trial court have the effect of a jury verdict on appeal. In considering the sufficiency of the evidence to sustain the judgment, the evidence will be considered in the light most favorable to the successful party, any controverted fact will be resolved in that party's favor, and the successful party will have the benefit of every inference reasonably deducible from the evidence. *Morfeld v. Bernstrauch*, 216 Neb. 234, 343 N.W.2d 880 (1984); *Rieschick Drilling Co. v. American Cas. Co.*, 208 Neb. 142, 303 N.W.2d 264 (1981).

The record shows the following. In the summer of 1979 plaintiff Rick Middagh was a mortgage broker operating in the Kearney, Nebraska, area under contracts with various financial institutions. At that time lessee Stanal Sound was a Nebraska corporation engaged in business in Kearney, Nebraska, and other locations, and engaged in selling, designing, engineering, and installing sound systems and providing large touring sound systems for major entertainers on a rental basis. Defendant Stan Miller was the president and a director of Stanal Sound and owned 50 percent of its stock, with the other 50 percent "in a trust and a repurchase agreement." Maurice Miller, the father of Stan Miller, was vice president and secretary of Stanal Sound and a director.

Rick Middagh was contacted by Stan Miller in the summer or fall of 1979 to find financing for Stanal Sound for purposes of

obtaining warehouse property. Rick Middagh was unable to obtain financing for Stanal Sound from banking institutions.

After he was unable to obtain institutional financing, Rick Middagh worked on private financing and looked at various properties in Kearney with the Millers. The mutual object of the looking was to find a location acceptable to the Millers (acting for Stanal Sound) which private investors could buy and lease back to Stanal Sound for a long term. Rick Middagh ultimately found property with a warehouse that he was willing to buy personally and lease to Stanal Sound. The transaction was discussed with the Millers. Rick Middagh signed an agreement to purchase the property in question on December 10, 1979. The date the purchase by the Middaghs was completed is not shown in the record. Stanal Sound went into possession of the premises at some time between December 1 and 15 of 1979. The lease involved herein was signed by Maurice Miller, for Stanal Sound, in February of 1980 and by Stan Miller, for himself personally, in May of 1980. The lease had an effective date of December 15, 1979, and was for a period of 10 years.

Although the lease had been signed by Stanal Sound and Stan Miller in February and May, respectively, of 1980, it was not until approximately October of 1980 that Rick Middagh began to make firm arrangements for the long-term financing for his purchase of the property leased to Stanal Sound. In the meantime Rick Middagh had advanced his own funds and had short-term financing with a bank.

Rick Middagh informed Maurice Miller, acting for Stanal Sound, that the financing institution would not give Middaghs the necessary long-term financing unless the lessees would cosign the necessary promissory note with Middaghs. This requirement was reflected in a November 14, 1980, commitment letter from the lending agency to the Middaghs. The Millers refused to cosign Middaghs' note. After discussions in which Rick Middagh pointed out to the Millers that he had personally borrowed the money on a short-term basis to lease the building to Stanal Sound, the Millers agreed to execute an acceleration rental clause as an amendment to the lease if that change in the lease would satisfy the lending institution. The first proposal was an acceleration clause for the entire 10-year

lease period. The Millers refused to sign such an acceleration, but did agree to sign an acceleration for a 1-year period if Middaghs would sign a buy-sell agreement, incorporated in a land contract, between Stan Miller and the Middaghs on the leased property.

An addendum to the lease was prepared. On March 6, 1981, at a meeting in Kearney, the addendum was signed by the Middaghs and by Maurice Miller as secretary of Stanal Sound. At the time of this meeting, and before Maurice Miller signed for Stanal Sound, an option agreement providing for the purchase of the leased property on a deferred basis rather than cash was prepared. In the presence of the Middaghs, Maurice Miller talked by telephone to Stan Miller in California and then signed the option agreement, over Stan Miller's typed signature, "by Maurice W. Miller." The record shows that, although there was evidence to the contrary, the addendum to the lease was signed by Stan Miller at an undetermined later date and mailed to Rick Middagh in either May or June of 1981. Confusion resulted from the fact that, at the trial, several copies of the addendum not bearing the signature of Stan Miller were received, as well as one signed copy of the addendum. There is sufficient evidence, however, to sustain the court's implied finding that the addendum was signed by Stan Miller and delivered to Rick Middagh.

The original lease, effective December 15, 1979, provided for rental of $1,562.50 per month for the first year and $1,625 per month for the remaining 9 years of the 10-year lease. That lease further provided that the Middaghs agreed to erect an 8-foot-high chain link fence, with barbed wire above it, around the premises by July 1, 1980. Among the other terms of the lease, there were provisions requiring the lessees to provide certain insurance, to pay the real estate taxes, and to make a security deposit of 1 month's rent.

The "Addendum to Lease" of March 6, 1981, provided that on lessees' default, the lessors would have the right to accelerate the rental payments due for 1 year in advance in the sum of $19,500.

It is the validity and effect· of this addendum that is the subject of lessees' first assignment of error. The trial court

found that the addendum was properly executed and delivered and operated to amend the lease to permit the Middaghs to accelerate 1 year's rental on lessees' default and that the addendum bound both Stanal Sound and Stan Miller.

Lessees state that our law requires that the modification of a contract requires the assent of all parties to the contract, citing 17 Am. Jur. 2d *Contracts* § 465 (1964), and that consideration is an essential element to the validity of a contract, citing *Erftmier v. Eickhoff*, 210 Neb. 726, 316 N.W.2d 754 (1982), and *Omaha Nat. Bank v. Goddard Realty, Inc.*, 210 Neb. 604, 316 N.W.2d 306 (1982). We agree fully with lessees' statements of law. The dispositive facts in this case, however, are (1) that the trial court determined that there had been assent to the modification of the original December 15, 1979, lease by all parties and (2) that there was adequate consideration.

As stated above, although there was a dispute in the evidence, there was sufficient evidence to sustain the trial court's determination, inherent in the trial court's determination of liability against the lessees, that all parties assented to the addendum.

The trial court also determined there was adequate consideration. That consideration was the execution of an option agreement, giving to Stan Miller the option to buy the property in question on specific deferred terms, rather than for cash as set out in the original lease. This option was both a benefit to Stan Miller and a detriment to the Middaghs and was, therefore, adequate consideration for the execution of the addendum. *Erftmier v. Eickhoff, supra; Omaha Nat. Bank v. Goddard Realty, Inc., supra.* The trial court was correct in determining that the addendum modified the original lease and that the Middaghs were entitled to the benefit of the terms of the addendum upon lessees' default.

Lessees' second assignment of error is that the court erred in failing to determine that the Middaghs had constructively evicted lessees from the premises by failing to erect a fence around the property as required by the lease. It would follow, of course, that if lessees were constructively evicted by Middaghs' default, lessees would not be in default under the lease terms. On this question the evidence before the trial court,

although again conflicting, supports the following factual determinations.

The lease required Middaghs to construct a specific type of fence by July 1, 1980. In the purchase contract between Middaghs and the party from whom they were buying the property, there was a requirement that a fence be constructed, which was necessary to satisfy an obligation of the seller to construct a fence along one boundary. Rick Middagh discussed the fence requirement in his purchase contract with Maurice Miller, who questioned the utility of the type of fence and its placement on property as far as it would be of any use to Stanal Sound. Rick Middagh testified that neither Maurice nor Stan Miller had made any statements regarding a fence prior to Rick's mention of the fence in the purchase contract. Maurice did not demand any particular type of fence or a specific date for construction of the fence. The December 15, 1979, lease specified a specific type of fence and an installation date of July 1, 1980. The fence was not installed by the specified date because the Middaghs were not able to pay for the installation.

Rick Middagh informed Maurice that since Stanal Sound would not cosign for his long-term financing, he could not afford to install the fence at that time. Maurice informed Rick that the long-term financing was the priority and that the fence was not a problem. Neither Maurice nor Stan told Rick that the fence was a concern at that time. Maurice also informed Dale Ellis, another party sought by Rick to join the financing, that the fence was not of great importance because none of Stanal Sound's other storage facilities had security fences. No demands were made that the fence be installed by July 1, 1980. There was no written correspondence which discussed the fence until September of 1982. Neither of two letters written by Stanal Sound to the Middaghs, one dated February 10, 1981, and the other dated May 4, 1981, complained of the failure to construct the fence by July 1, 1980, nor indeed mentioned the fence at all.

Maurice Miller testified regarding many aspects of the case, and he was unaware of any correspondence regarding the fence or the lack thereof until the letter of September 28, 1982, when Stanal Sound informed the Middaghs that the failure to erect the fence was the justification of the lessees in considering the

lease broken. Maurice Miller knew of no security problems or break-ins and testified that none of their other facilities had security fences.

Stanal Sound made its last rent payment on October 15, 1982. The letter dated September 28, 1982, referred to above, had been sent to Rick Middagh inquiring about the fence and asserting that he was in breach of contract. Rick Middagh informed Stanal Sound that the fence would be installed by December 27, 1982. Stanal Sound, by a letter authorized by Stan and dated November 8, 1982, informed Rick that the lease was terminated.

The lease provides a right of termination to the lessors only. The fence was said to be the only reason to terminate the lease. Stanal Sound completely vacated the premises by December 1, 1982. Stanal Sound did not lease or purchase any other storage facility after it vacated the premises in question. The Middaghs relet the premises on June 1, 1983, for a period of 19 months.

The basis of lessees' contention is that they were constructively evicted from the premises. To constitute a constructive eviction it must be shown that the premises were rendered "unfit for occupancy for the purposes for which they were leased or [were rendered unfit so as to deprive] the lessee of the beneficial use of the premises . . . ." *May v. Marijo Corp.*, 207 Neb. 422, 423, 299 N.W.2d 433, 434 (1980). In this case the premises were used for the intended purpose for approximately 3 years without complaint. There was no change in the condition of the building and no change in the overall situation which would render the premises unfit. The lessees had not been deprived of the beneficial use of the leased property. There had not been any break-ins, to their knowledge. Further, none of Stanal Sound's facilities had security fences, nor did their prior storage facility. A constructive eviction is not supported by the evidence in this case. That lessees did not consider the fence vital to their operation under the lease is conclusively shown by the fact that lessees were willing to, and did, execute an addendum to the lease in the spring of 1981, when the lease itself provided for the erection of the fence by July 1, 1980.

Since defendants were not constructively evicted and since the contract did not provide defendants a right of termination,

defendants' only recourse was a suit for damages. *Hogan v. Pelton*, 210 Neb. 530, 315 N.W.2d 644 (1982). Since the lessees vacated and discontinued rental payments instead of suing for damages, defendants were in default of their obligation under the lease.

Lessees' other assignments of error concern the allowance of other damages for their default. Lessees contend that Middaghs were either not entitled to any of the other specified damages or were not entitled to them in the amounts awarded. Lessees assert that the court incorrectly interpreted a clause in the lease requiring defendants to provide insurance coverage. While the judge did not specifically state an interpretation, the order awarded plaintiffs $240 for unpaid insurance. We find that the court correctly awarded damages under the language of the clause which required defendants to insure the property. Lessees failed to fully insure, and the Middaghs paid for the coverage. In so doing the Middaghs were damaged.

Lessees also assert that the award of other damages, such as $1,465 for minor repairs and $447.57 for real estate taxes, was not justified under the evidence. With this we also disagree. Lessees do not specifically challenge the award for unpaid taxes, but they challenge the award for minor repairs, claiming that there was no competent evidence to support the award. The evidence before the trial court sustains its findings as to the damages incurred by the Middaghs.

In the remaining assignments of error, lessees contend that the Middaghs failed to mitigate their damages and are not entitled to reletting expenses. Lessees contend that the evidence supports neither finding. As stated above, the findings of the trial court's questions of fact are not reversed on appeal unless clearly wrong. We find no evidence, and lessees present no argument, to show the Middaghs' actions were unreasonable. The evidence indicates that the Middaghs found another lessee who, while refusing to pay the amount of rent which defendants paid, paid a sum that we cannot say was unreasonable as a matter of law. The evidence indicates that the subsequent lessee was the only party interested in re-leasing the premises. Further, the Middaghs advertised or listed the premises and in doing so requested an amount greater than that to which the subsequent

lessee would agree to pay. There was no basis to find the lower court clearly wrong regarding mitigation. The Middaghs were entitled to recover the remaining rent and the expenses incurred in reletting the premises. *Birkel v. Hassebrook Farm Serv.*, 219 Neb. 286, 363 N.W.2d 148 (1985).

Finally, lessees implicitly contend that the setoff allowed by the lower court was insufficient. They specifically argue that the court erred by refusing to allow a witness to testify that the rental value of the premises was reduced by 15 percent due to the absence of the fence. Upon reviewing the record, we find that the court properly excluded the witness' testimony because, as plaintiffs asserted in objecting, there was no proper and sufficient foundation upon which the witness could base an opinion as to rental values. The witness was an employee of Stanal Sound and had no knowledge of the relevant market or comparable rentals. The opinion of this witness was not based on any foundation and was properly excluded. As stated in *Schmidt v. J. C. Robinson Seed Co.*, 220 Neb. 344, 348, 370 N.W.2d 103, 106 (1985), "The trial court is given large discretion in determining whether or not a witness' qualification to state an opinion has been established, and such discretion will not ordinarily be disturbed on appeal unless there is an abuse of that discretion."

Middaghs cross-appeal and argue that there was no evidence to allow the court to determine a rental adjustment of $150 per month for 59 months to be allowed as a credit on lessees' payments due under the lease. The record shows no facts to support a counterclaim or setoff formulated in this manner.

In determining the amount of damages which lessees suffered by reason of Middaghs' failure to erect a fence around the leased premises, we are governed by the general rule that in calculating the damages due a lessee for failure of the lessor to install items required by the lease, lessee's damages are limited to the difference between the reasonable rental value of the property as it was as compared to what it was contracted to be. *Master Laboratories, Inc. v. Chesnut*, 154 Neb. 749, 49 N.W.2d 693 (1951); *Partridge v. Dykins et al.*, 28 Okla. 54, 113 P. 928 (1911); *Kellogg v. Malick*, 125 Wis. 239, 103 N.W. 1116 (1905); *Noble v. Tweedy*, 90 Cal. App. 2d 738, 203 P.2d 778 (1949). See,

also, 49 Am. Jur. 2d *Landlord and Tenant* § 859 (1970). In other words, in this case lessees had paid rental (beginning July 1, 1980) for fenced property. That property was leased initially for $1,562.50 and later for $1,625 per month. Without a fence the property might have a lesser rental value. In this case, however, the only evidence suggesting a reduction in rental value was the evidence of lessees' employee, as discussed above, which was properly excluded for lack of proper and sufficient foundation. We therefore find that, on the record before us, it was error to reduce plaintiffs' recovery by $8,850 for rent adjustment. Lessees not only failed to prove an amount of reduced rental value due to the absence of a fence but they also failed to prove that there would be any reduction of rental value at all. No losses were attributable to the absence of a fence. Maurice Miller stated that he had no knowledge of any losses or damages suffered by Stanal Sound in the absence of the fence.

Middaghs also contend that there was no basis upon which to credit defendants for the security deposit. This issue is not discussed by Middaghs in their brief. Plaintiffs assert only that since the lease could not be terminated by defendants, the security deposit should not be returned. We do not agree. It was not error to credit the lessees with the amount of the security deposit to the damages assessed against lessees.

The decision of the district court is, therefore, affirmed in part and in part remanded with directions to increase the amount of the judgment by $8,850 to comply with this opinion.

AFFIRMED IN PART, AND IN PART
REMANDED WITH DIRECTIONS.